***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner; the appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby modifies the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in the Form 21 Agreement for Compensation, which was approved by the Commission on October 21, 1999, in their Pre-Trial Agreement and at the hearing as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Kemper Insurance Company was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. I.C. File 914378 involves an admittedly compensable injury sustained on February 14, 1999. At the time of this injury, plaintiff's average weekly wage was $689.65, which yielded a compensation rate of $459.79. Defendants filed a Form 60, Employer's Admission of Employee's Right to Compensation, on or about February 26, 1999, following which plaintiff received indemnity benefits from February 22, 1999. Pursuant to the Form 21 Agreement, plaintiff received twenty-one weeks of permanent partial disability compensation as a result of the seven percent rating to his back.
5. I.C. File 003143 involves an alleged injury sustained on December 6, 1999.
6. For the fifty-two week period prior to December 6, 1999, plaintiff's average weekly wage was $522.67, which yields a compensation rate of $348.46 per week, based upon the Form 22.
7. The issues for determination are:
 a. Is plaintiff entitled to temporary partial disability benefits beginning on December 6, 1999?
 b. Is the selector job suitable to plaintiff's restrictions?
 c. Is plaintiff entitled to any additional compensation as a result of the injuries giving rise to these claims?
8. The parties stipulated the following documents into the record:
 a. I.C. Forms 18, 19, 21, 33, and 60 in I.C. No. 914378,
b. I.C. Forms 18, 33, 33, and 61 in I.C. No. 003143,
c. MDI Job Description and Warnings, three pages,
d. Frye Regional Medical Center, four pages,
e. Piedmont Sports Therapy, two pages,
f. Dr. Jeffrey Knapp, twenty-five pages,
g. Dr. Carlos de la Garza, eight pages,
h. Kemper Care Management, nine pages, and
i. Dr. Peter Miller, two pages.
9. Defendants agreed at the evidentiary hearing to pay plaintiff temporary partial disability benefits for the period from December 6, 1999 through December 30, 1999, while plaintiff was on light duty. However, defendants do not agree that plaintiff sustained an injury as a result of a specific traumatic incident or a change of condition.
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following additional
 FINDINGS OF FACT
1. At the time of the evidentiary hearing, plaintiff was a forty-two year old male, who began working for defendant-employer on December 5, 1994, as a selector in the meat department (warehouse selector job). Plaintiff's duties included taking a pallet jack down the meat aisle to select cases of meat for shipment to grocery stores. The cases weighed between forty to one hundred and ten pounds.
2. Following the admittedly compensable injury of February 14, 1999, plaintiff was initially treated at Frye Hospital. He was eventually referred to Dr. Jeffrey Knapp, an orthopedist, who performed an L3-4 laminectomy on May 28, 1999.
3. On June 22, 1999, Amy Hughes of Kemper Care Management conducted an evaluation of the warehouse selector job. The essential functions of the job require the employee to obtain an order ticket, operate a pallet jack in the area to select items from the four or five shelves, place items in totes or on pallets, have the pallet wrapped, and take the order to the trucks. Occasionally, the selector may be required to help load the orders on the trucks. The selector job is classified as a heavy physical demand job, requiring lifting of up to one hundred pounds.
4. Plaintiff reached maximum medical improvement from his initial back injury and surgery on September 9, 1999, at which time Dr. Knapp issued a fifty pound lifting restriction.
5. Based upon the permanent restrictions imposed by Dr. Knapp, the warehouse selector job was not suitable to plaintiff's physical capabilities. Therefore, the employer assigned him to perform paperwork on a temporary basis. On or about October 30, 1999, the employer assigned plaintiff to work in the non-foods department, which included household items, cookware, and health and beauty aids. He was placed on a spur job initially, where he unloaded filled totes on pallets to prepare for shipping. Plaintiff was also assigned to sweep and to pull totes for the selectors. The non-foods selector job (also called mezzanine selector or little room selector) required reaching for items, most frequently at waist level, and placing items in a tote or totes. Although the orders were designed to weigh a maximum of thirty-five pounds, the filled tote could weigh between thirty-five and forty pounds on occasion. Selectors in the non-food department were required to select and pack 800 pieces per hour to meet the ninety-five percent production standard.
6. On December 6, 1999, plaintiff was assigned to get totes for other selectors as a light duty assignment. A tote weighs approximately 6 pounds. Plaintiff had to obtain totes from under the conveyor, and he was expected to retrieve three totes at a time. During the course of his shift, plaintiff experienced a catch in his back, which he promptly reported to his supervisor, Stan Dellinger. During the remainder of the shift, plaintiff's back pain worsened and Mr. Dellinger eventually referred plaintiff to Dr. de la Garza for treatment.
7. On December 7, 1999, Dr. de la Garza examined plaintiff for an episode of back pain after lifting a crate at work. Following the examination, Dr. de la Garza restricted plaintiff to a twenty-five pound lifting limit and no frequent bending, twisting, turning, stooping or squatting. Dr. de la Garza diagnosed plaintiff with a back strain. On December 30, 1999, plaintiff requested that Dr. Piland release him to his regular (non-food selector) job, due to the assignments he was being provided. On or about December 30, 1999, plaintiff's back strain had improved and he returned to his pre-December 6, 1999, baseline.
8. After no further treatment was offered to plaintiff by Dr. Piland or Dr. de la Garza, plaintiff sought treatment on his own from neurosurgeon Dr. Peter Miller. Dr. Miller eventually referred plaintiff for epidural steroid injections at Unifour Pain Treatment Center. Plaintiff received relief from his back pain as a result of this treatment. On May 23, 2000, a repeat MRI revealed no change in plaintiff's back since the prior report.
9. On February 3, 2000, defendant-employer gave plaintiff a verbal warning for production at 79.24 percent. Plaintiff was given two weeks to correct the deficiency. During his assignment to non-foods, plaintiff requested to be reassigned due to back pain and concerns about reinjuring himself. Defendants, however, did not honor this request, as it was their policy not to move an employee as long as that employee was not meeting production.
10. On March 4, 2000, plaintiff received a written warning for production at the 67.23 percent level. He was given a three-day lay-off on March 14, 15 and 17, 2000.
11. The greater weight of the evidence is that the non-food selector job was suitable for plaintiff given the restrictions that were placed on him for his compensable injuries. Dr. Knapp found plaintiff capable of performing the non-food selector job even though Dr. Knapp modified plaintiff's lifting restriction to 25 pounds frequently and 40 pounds occasionally. Dr. Knapp's opinion was supported by a Functional Capacity Examination (FCE) of plaintiff and by Dr. Knapp's review of a videotape depicting the job performed by another employee. Plaintiff's failure to accept this position and perform it to his abilities constitutes the refusal of suitable employment and refutes any inference of disability.
12. On March 26, 2000, the employer terminated plaintiff's employment due to his failure to meet production standards. Since his termination, plaintiff has sought work and received unemployment compensation. Plaintiff subsequently obtained other employment.
13. Plaintiff sustained an injury as a result of a specific traumatic incident of the work assigned on December 6, 1999, when he sustained a back strain which caused a temporary flare-up of the pre-existing compensable back injury, but the new strain resolved and plaintiff returned to baseline by December 30, 1999.
 ***********
The foregoing findings of fact engender the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury as a result of a specific traumatic incident of the work assigned arising out of and in the course of the employment on December 6, 1999. N.C.G.S. § 97-2(6).
2. Plaintiff is entitled to temporary partial disability compensation at the rate of two-thirds of the difference between his pre-injury wage and the actual post-injury wage for the period from December 6, 1999 through December 30, 1999, as a result of the back strain sustained on December 6, 1999. N.C.G.S. § 97-30.
3. Plaintiff has failed to establish that he was disabled after March 26, 2000, and the greater weight of the credible evidence is that plaintiff refused suitable employment when he failed to perform to his capability in the non-food selector position. Therefore, plaintiff is not entitled to further compensation for this claim. N.C.G.S. §§ 97-29,97-30.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, subject to the limitations of Section 97-25.1. N.C.G.S. § 97-2(19). Plaintiff is further entitled to have defendants pay for medical expenses incurred as a result of treatment by Dr. Miller and Unifour Pain Treatment Center. Plaintiff is entitled to continue such treatment with Dr. Knapp, Dr. Miller or Unifour Pain Treatment Center as may be necessary.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay plaintiff temporary partial disability compensation at the rate of two-thirds of the difference between plaintiff's pre-injury wage and his actual post-injury wage after the December 6, 1999, injury until December 30, 1999. Said compensation has accrued and shall be paid in a lump sum, if not already paid.
2. Plaintiff's further claims for disability benefits are denied.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraph 1 is hereby approved to be deducted from sums due plaintiff and paid directly to counsel, if the sums in paragraph 1 were not previously paid.
4. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act, subject to the provisions of N.C.G.S. § 97-25.1.
5. Defendants shall pay the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ THOMAS J. BOLCH COMMISSIONER